UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELROY PEDRO GOMEZ,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>WILLIAM "JOE" SULLIVAN,<br><br>　　　　　Respondent. | Case No. 19-cv-06129-SI<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Elroy P. Gomez filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed an answer to the petition. For the reasons discussed below, the Court denies the petition.

**BACKGROUND**

Elroy P. Gomez challenges his conviction for attempted premeditated murder arising from an incident with the victim at Gomez's home. In his federal petition for writ of habeas corpus, Gomez's sole claim is that his constitutional right to effective assistance of counsel was violated "by the failure of his court-appointed attorney to advise and encourage him to accept the prosecution's offer of a 9-year sentence." Dkt. No. 1 at 39 (Petition). Gomez contends that he would have accepted the plea offer if counsel had informed him of several facts about the certainty of a conviction for assault with a deadly weapon and the fair chance of a conviction for attempted murder, either of which carried a sentence that would be longer than that offered to him in the plea deal.

Because Gomez's ineffective-assistance claim raises questions regarding the likelihood of his conviction, it is helpful to understand the basic details of the rather unusual criminal episode.

The California Court of Appeal described the facts of this case as follows:

> At around 8:00 a.m. on September 17, 2014, the victim was drinking coffee and smoking a cigarette outside his San Leandro home when Gomez approached him. He had met Gomez through a mutual friend earlier that summer, and they had visited each other's homes a couple times. The victim was six feet tall and weighed about 210 pounds, and he agreed that Gomez was "[q]uite a bit smaller."
>
> Gomez appeared "agitated" and demanded that the victim come with him to talk to Gomez's father. The victim did not understand what Gomez was talking about and initially refused to leave. But the victim eventually agreed to go with Gomez because he did not want to disturb his neighbors or a woman who was staying at his house.
>
> Gomez and the victim began walking to Gomez's house, where Gomez lived with at least one of his parents. During the walk, which took 20 to 30 minutes, Gomez was walking three to six feet behind the victim and "very strict about where [the victim] was going in relation to him," directing the victim to walk near the sidewalk's edge and keep his distance. During the walk, the victim's cell phone rang, and Gomez took the phone from the victim's hand. The victim perceived this action as threatening and aggressive, and he got nervous as they approached Gomez's house. The victim did not attempt to leave, however, because he wanted to fix whatever misunderstanding had led to the encounter.
>
> When they reached Gomez's house, Gomez directed the victim into the garage, part of which was set up as Gomez's living area. Gomez locked the door and told the victim to sit on a cooler. The victim testified that Gomez said he had been hired to kill the victim by 10:00 that morning and "alluded to something [like] I talk too much" but refused to tell the victim who wanted him killed. Gomez also said that "he took an oath to do what he was . . . hired to do" and showed the victim some bullets in a nightstand drawer.
>
> Gomez pulled out a box cutter and showed it to the victim. Gomez then took off his shirt, "scuff[ed]" the box cutter across his chest, and stated again that he was going to kill the victim. Holding the box cutter, Gomez directed the victim "to turn to the mirror and . . . 'to take it like a man.'" In the victim's words, Gomez "was going to – he wanted to [slit] my throat." The victim said he was not going to let Gomez kill him, and he refused to turn his head.
>
> Gomez then ordered the victim into the backyard and told him to sit in a chair in the corner. The victim refused because he did not want "to be cornered and out of sight." Gomez became angry and hit the victim in the jaw. The victim saw "blood pouring down [his] chest" and Gomez said, "'I got you'" and "'You're going to bleed out.'" At that point, the victim noticed that Gomez was holding the box cutter, which explained the severity of the injury. Gomez threw the box cutter over the fence into a ravine.
>
> The victim took off his shirt and tank top, tied the tank top around his neck to try to stop the bleeding, and put the shirt back on because it was cold outside. The victim

was scared, and he tried to "talk [Gomez] out of this whole thing." Gomez directed the victim back to the garage, where he had the victim sit on the cooler again. Gomez told the victim that he was "going to have to do this" and the victim's "time [was] running out," and he also asked the victim whether there were any "last things [he] want[ed] or need[ed to] say or do." The victim continued to try to talk Gomez out of his plan: "I saw there was an opportunity. There was this human side of him that, one, he was going to kill me. It was absolute. And there was one that would seem to calm down because I kept trying to remind him . . . [t]hat I didn't want to fight with him."

The victim asked Gomez for a half gallon of orange juice that was nearby, and Gomez agreed he could take it.[1] As the victim was drinking, Gomez indicated that someone else was in the house and yelled toward a room, but no one responded. The possibility that another person was present worried the victim, and he continued to "try to defuse the situation" by talking to Gomez.

> [Footnote 1:] On cross-examination, the victim testified that it was a half gallon of peppermint schnapps, not orange juice, and he drank about a shot.

Gomez directed the victim to the backyard again, and the two men continued to talk. Gomez seemed less threatening and upset, and the victim kept "trying to talk him down." Gomez used a garden hose to hose down the victim, and he then directed the victim into the kitchen. Inside, it seemed like Gomez was considering what the victim was saying, but Gomez repeated that he had to kill the victim. Gomez also embraced the victim and stated, "'I love you[,] brother.'" The victim responded that he loved Gomez too.

Gomez directed the victim back to the garage for a third time, where he again told the victim to sit on the cooler. At some point earlier in the encounter Gomez had produced a knife and cut the victim in a different part of his neck. As the victim sat on the cooler for the third time, Gomez "stood right up against [the victim] pressing . . . the weight of his legs against [the victim] and he had the knife in his hands." Gomez then "struck" the victim's knee with the knife so deeply that the victim could see bone. The victim took off his shirt and used it as a tourniquet around his thigh. As the victim was taking his shirt off, Gomez "struck" the victim's hand with the knife.

Less than a minute after cutting the victim's hand, Gomez walked the victim to the front door and told the victim to leave and not "'rat'" on him. Gomez also said, "[N]ow, you can go out there and tell everybody . . . not to mess with me," or "something to that effect." The victim began walking away, looking for help. After he reached another street, a witness noticed that he was bleeding and flagged down an Alameda County Sheriff's deputy. An ambulance took the victim to the emergency room.

Gomez's next-door neighbor testified that around 6:30 a.m. that morning, he "heard some very loud conversations" coming from Gomez's house. Less than an hour later, the neighbor heard "a loud, aggressive bang on [his] front door" and opened it to see Gomez, with whom he had never interacted. Gomez began to "scream" at him,

3

saying, "'[Y]ou better not fuck with me. I set you straight. You have been told. You just better not fuck with me.'" When the neighbor asked Gomez what he was talking about, Gomez turned and left.

Several hours later, sometime after 10:00 a.m., the neighbor saw Gomez and a man whom he identified as the victim standing in Gomez's backyard. Gomez, who had his shirt off, "was pacing back and forth" and "kind of growling in anger." The victim appeared "to be trying to de[-]escalate and calm [Gomez] down." The neighbor watched the men for three to five minutes but did not observe any physical altercation or any weapons, and the next time he looked back they were gone.

The victim's treating surgeon testified that the victim had three lacerations on his neck, one of which was so deep that it approached the carotid artery. Another laceration had a piece of blade in it, and the surgeon opined that "it would require quite a bit of impact" to the victim's neck for part of the weapon to be left behind. The victim required sutures in his neck and staples in his knee. The victim later developed infections in his face, limiting his ability to eat, and had to return to the hospital for additional treatment and pain medication. The surgeon testified that the victim's injuries could have been life-threatening if they had been left untreated.

The police arrested Gomez, who had scratch marks on his chest and a cut on his hand that appeared to have been made by a blade. A search of his garage uncovered ammunition and "a kitchen knife or steak knife" in a dresser, another knife tucked into some clothing, and a bloody tank top. There were also blood drops on the walkway to the front door and inside the garage. The police searched the ravine, but it was dark and they were unable to recover a box cutter or any other cutting instrument. Gomez did not present any evidence, and his defense focused on attempting to undermine the victim's credibility. Bearing on the victim's general credibility, the victim admitted that he had a previous conviction for disturbing the peace based on a domestic violence incident and two DUI charges pending, but he also testified that he had not been promised anything by the district attorney in exchange for his testimony. The victim also admitted that he suffered from bipolar disorder and had a history of alcoholism. Bearing on the victim's credibility about the day in question, Gomez's trial counsel suggested that the victim had come to Gomez's house to get methamphetamine and the two had argued. While the victim admitted he had smoked methamphetamine before, he denied ever doing so with Gomez or visiting Gomez's house that day to obtain the drug.

The jury convicted Gomez of attempted premeditated murder and found true the allegations that during that crime Gomez personally inflicted great bodily injury on the victim and personally used a deadly and dangerous weapon. The jury also found Gomez guilty of possession of ammunition by a felon and assault with a deadly weapon and found true the allegation that Gomez personally inflicted great bodily injury on the victim during the assault.

After the trial court found true the allegation that Gomez had a prior conviction for a serious felony, it sentenced him to a total term of 24 years and four months to life in prison.

California Court of Appeal Opinion filed January 19, 2018 in *People v. Gomez*, No. H56903, 1-6 (Cal. Ct. App. January 19, 2018) (unpublished) (footnotes omitted).

Gomez appealed his conviction. The California Court of Appeal affirmed his conviction. Dkt. No. 11-3 at 27 (Answer, Exhibit E). The California Supreme Court denied his petition for review. *Id.* at 82 (Answer, Exhibit G). Gomez filed petitions for writ of habeas corpus with the California Court of Appeal and California Supreme Court. *Id.* at 84 (Answer, Exhibit H). The California Court of Appeal summarily denied his petition for writ of habeas corpus. Dkt. No. 1 at 79. The California Supreme Court also summarily denied his petition for writ of habeas corpus. Dkt. No. 11-3 at 93 (Answer, Exhibit I).

Gomez then filed this action arguing that his constitutional right to effective assistance of counsel was violated during the plea negotiations. Dkt. No. 1.

**JURISDICTION AND VENUE**

This Court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**STANDARD OF REVIEW**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

5

evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

## DISCUSSION

A threshold matter to resolve is to determine the state court decision to which 28 U.S.C. § 2254, applies because Gomez presented the claim in two procedurally different circumstances. Gomez first presented an ineffective-assistance claim on direct appeal, where it was rejected because the claim was not supported by the evidence in the record on appeal. Dkt. No. 11-3 at 26. The state

6

1  appellate court explained that, because the "presumption of counsel's competence can usually be
2  rebutted only with evidence outside the record, a reversal on direct appeal is not warranted unless
3  '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act
4  or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could
5  be no satisfactory explanation.'" *Id.* (citation omitted). Gomez later presented his ineffective-
6  assistance claim in a state habeas petition and submitted declarations in support of the habeas
7  petition. The California Court of Appeal and the California Supreme Court denied the habeas
8  petition without discussion. Given that the rejection of the claim on direct appeal was due to the
9  procedural problem that the appellate court could not provide relief for a claim that had to be proven
10 with materials outside the record on appeal, and given that Gomez later provided materials beyond
11 the appellate record when he presented his claim again in a state habeas petition, this court concludes
12 that the California Supreme Court's unexplained denial of the habeas petition is the decision to
13 which 28 U.S.C. § 2254(d) applies. Thus, this court "must determine what arguments or theories
14 supported or . . . could have supported" the California Supreme Court's rejection of the claim, "and
15 then it must ask whether it is possible fairminded jurists could disagree that those arguments or
16 theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court.
17 *Harrington v. Richter*, 562 U.S. at 102.

## I. The Plea-Bargaining Efforts

Gomez's ineffective-assistance claim rests on the premise that a 9-year plea was offered to him. Respondent, however, disputes that a 9-year offer was ever made, claiming that "the record is unclear as to what plea offers were made by the prosecution and when any such offers were made." Dkt. No. 11-1 at 15. Some of the confusion appears to be due to the fact that three different trial prosecutors and one supervising prosecutor were involved in the case. Although the record is not particularly clear, it appears to show the following:

On December 8, 2014, a preliminary hearing was held. Dkt. No. 12 at 18. At the preliminary hearing—when Gomez had been charged with attempted murder but not yet charged with assault with a deadly weapon—Gomez's attorney argued that the evidence was not sufficient to "indicate

that this is an attempted murder," but that "we may have an assault here." *Id.* at 91-92.

A few months later, on February 2, 2015, the prosecution extended a 13-year plea offer to Gomez. Dkt. No. 12-1 at 30-31. According to the supervising deputy district attorney, Matthew Golde, Gomez rejected this offer because he wanted a drug program. *Id.*

On July 8, 2015, the prosecution amended the charges against Gomez to add a charge under California Penal Code Section 245—assault with a deadly weapon. *Id.* at 114-120.

The first trial began on August 31, 2015. *Id.* at 145. Shortly before that, on August 18, 2015, Christopher Chin was listed—for the first time—as the deputy district attorney for the case, replacing Matthew Gaidos. *Id.* at 129, 130. On September 1, 2015, the parties conducted plea negotiations off the record. *Id.* at 149. According to the clerk's minutes, the prosecution extended an offer to Gomez, and Gomez rejected it. *Id.* The record does not indicate why Gomez rejected this offer. On September 21, 2015, a mistrial was declared because of the health issues of Gomez's attorney. *Id.* at 153.

On February 1, 2016, the trial court stated that "Mr. Golde had indicated he would let Mr. Gomez plead to 9 years at . . . 80 percent as a strike on a 245." *Id.* at 5. Mr. Golde then replied, "I thought it was 85 percent." *Id.* Notably, on that date, Mr. Golde did not refute that a 9-year offer was ever made.

The second trial began on February 2, 2016. *Id.* at 168. The deputy district attorney listed for the case was Ashley Dodson. *Id.* On February 8, 2016, supervising deputy district attorney Golde was present and summarized the plea negotiations as he recalled them. Dkt. No. 12-1 at 30-31. He stated that he did not recall making a 9-year plea offer but "maybe it was" made. *Id.* Deputy district attorney Dodson then stated that her predecessor (Christopher Chin) had made a note, "I believe in September [2015], that the last offer was the 245 at nine years, but it was not made since I have been the DA in this courtroom." *Id.* The trial court also recalled that a 9-year offer was made to Gomez but was rejected. *Id.* at 30 ("Well, my understanding was, was that Mr. Gomez flatly rejected the last offer of nine years.").

8

**II.      Gomez's Contentions**

Gomez points to twelve "facts" which he claims, if explained to him, would have made him accept the plea offer. Dkt. No. 1 at 65. Among these alleged "facts" are assertions, such as:

> A. That I had no defense to the 245 charge;
>
> B. That I would certainly be found guilty of [the 245] charge, even if I were found not guilty of the attempted murder charge;
>
> . . .
>
> F. That I had no defense to the allegations of having a prior serious-felony conviction;
>
> . . .
>
> H. That, as a result of being found guilty of [the 245 charge], with said . . . enhancement[s] . . ., I would be sentenced to . . . a minimum sentence of 12 years and a maximum of 16 years, even if I were found not guilty of attempted murder;
>
> I. That there was a fair chance that I would be found guilty of attempted murder;
>
> J. That there was an even greater chance that, if I were found guilty of attempted murder, I would also be found to have deliberated and premeditated the attempted murder;
>
> K. That if I were found guilty of attempted murder *without* deliberation and premeditation, I would be sentenced to . . . [up to 27 years], and if I were found guilty of attempted murder with deliberation and premeditation, I would be sentenced to life imprisonment with a minimum eligibility for parole date of 7 years, doubled . . ., plus 9 years for the above enhancements (i.e., 23 years to life).
>
> L. That, under these circumstances, where I had no hope if I went to trial of being found not guilty of violation of section 245 or of the enhancement and prior-conviction allegations being found not true and, therefore, of being sentenced to less than 12 years and did have a chance of being found guilty of attempted murder and a greater chance of being found guilty of deliberate, premeditated attempted murder and being sentenced to a term as long as 26 years or 23 years to life, I had no rational choice but to accept the prosecution's offer of 9 years.

*Id.* at 63-65.  He declares that, had all these facts been explained, "I would have accepted the prosecution's offer of 9 years.  Instead [defense counsel] told me that we were going to beat the case." *Id.* at 65. Notably, he does not allege that he was not informed of the maximum sentence he faced if found guilty of all charges.  Instead, his carefully worded declaration, prepared by an

9

1  attorney, states that trial counsel did not predict the outcome for him and that counsel did not show
2  him how various sentences would be calculated upon a conviction.

**III.   Analysis**

     **A.   A Nine-Year Plea Offer Was Made**

Respondent argues that the state habeas court could have rejected the ineffective-assistance claim due to the absence of evidence that a 9-year plea offer was made. The court disagrees. Although the record is somewhat unclear about what offers were made, by whom, and when, it would have been unreasonable for the California Supreme Court to dismiss Gomez's ineffective-assistance claim purely on the basis that no 9-year plea offer was ever extended to him. Respondent's argument to the contrary rests on supervising deputy district attorney Golde's memory, which was contrary to that of deputy district attorney Dodson (based on her predecessor's notes), as well as the recollection of the trial court and Gomez. Even supervising deputy district attorney Golde stated that "maybe [the 9-year offer] was" extended to Gomez, conceding that he may just not have remembered it. *Id.* The evidence in the record heavily corroborates that a 9-year plea offer was extended to Gomez by the prosecution at or before the first trial in September 2015. *See* Dkt. No. 12 at 149; Dkt. No. 12-1 at 30-31.

Although it would have been unreasonable for the California Supreme Court to determine that there never was a 9-year plea offer, that court reasonably could have determined that the 9-year offer was not extended again in February 2016, as the second trial was beginning. But a determination that the 9-year offer was not extended again in February 2016 would not alone support a denial of habeas relief here because this court must determine whether there was ineffective assistance of counsel with respect to the 9-year plea deal that was offered in September 2015.

The assault with a deadly weapon charge under California Penal Code Section 245 (also occasionally referred to as the "245" charge) was added in a first amended information filed July 8, 2015, before the 9-year offer was made in September 2015. Because Gomez's primary argument is that his court-appointed attorney failed to properly account for and advise him of the likelihood of a 245 conviction, *see* Dkt. No. 1 at 38, regardless of whether the 9-year offer was re-

10

extended on February 1, 2016, any advice given by Gomez's attorney about that offer should have accounted for the 245 charge.

### B.     Legal Standard

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* The right to effective assistance of counsel applies to the performance of both retained and appointed counsel without distinction. *See Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980).

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland*, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). When analyzing an ineffective assistance of counsel claim under § 2254, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). A petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Under this standard, "if the state court reasonably concluded that Petitioner failed to establish either prong of the *Strickland* test," then a federal court cannot grant relief. *Cannedy v. Adams*, 706 F.3d 1148, 1157 (9th Cir. 2013).

11

**C.      Deficient Performance of Counsel**

For plea counseling to be deficient performance under *Strickland*, a petitioner must establish that the advice was "so incorrect and so insufficient that it undermined the defendant's ability to make an intelligent decision about whether to accept the plea offer." *Turner v. Calderon*, 281 F.3d 851, 880 (9th Cir. 2002) (internal quotations omitted). For bad advice to reach that level, it must be more than "a mere inaccurate prediction," as that, "standing alone, would not constitute ineffective assistance." *Iaea v. Sunn*, 800 F.2d 861, 865 (9th Cir. 1986). Deficient performance may exist where there is a "gross mischaracterization of the likely outcome" of a plea bargain "combined with . . . erroneous advice on the possible effects of going to trial." *Id.* Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689. The absence of evidence that counsel gave constitutionally inadequate advice cannot overcome the presumption that counsel's conduct was within the range of reasonable professional advice. *Burt v. Titlow*, 571 U.S. 12, 22-23 (2013).

Respondent argues that the state court could have found that Gomez failed to demonstrate deficient performance by his attorney because there may have been some tactical basis for the advice he gave to Gomez. Dkt. No. 11-1 at 17. Gomez's argument is that his attorney failed to advise him of the twelve "facts" because his attorney believed "it was highly unlikely that [Gomez] would be found guilty." Dkt. No. 1 at 38. Gomez references an email that his trial attorney wrote to his appellate attorney wherein his trial attorney says that "[t]he verdict surprised me more than any other in my experience." Dkt. No. 1 at 67.

The California Supreme Court could have found that Gomez's claims are not sufficiently corroborated by the record. Gomez states that his attorney did not explain twelve "facts" to him. Dkt. No. 1 at 38. He also states that his attorney—at some unidentified time—told him that they "were going to beat the case." *Id.* at 65. Nothing in the record corroborates these assertions, but there is evidence that tends to point against them. For example, there are two points in the record where Gomez's attorney acknowledges that a 245 conviction was possible, if not likely. The first instance was at the preliminary hearing, which was before the 245 charge was added and the 9-year

12

offer was made. *See* Dkt. No. 12 at 91-92 ("So I think that, you know, we may have an assault here, but an attempted murder, I don't think there's any evidence to indicate that this is an attempted murder."). The second instance was after the jury found Gomez guilty of all charges and the defense was moving for a new trial. *Id.* at 252 ("[T]he evidence in this case, in my opinion, certainly admits of an assault, I can't deny that."). Because these statements by Gomez's attorney sandwich the period where the plea offer was made, the California Supreme Court reasonably could have rejected the claim that rested only on Gomez's self-serving statements made after he had been convicted— that Gomez's attorney believed or would have advised him that he could "beat" the 245 charge. The attorney's later statement that the verdict "surprised [him] more than any other" could reasonably be read as referring to the attempted murder conviction rather than the 245 conviction. *See* Dkt. No. 1 at 67 ("It seemed improbable to me that the jury would convict of 187/664."). Further, there is evidence in the record of Gomez misconstruing prior statements made by his attorney or the trial court. *See, e.g.*, Dkt. No. 12-1 at 13-14 (trial court informs Gomez that everyone but Gomez recalled Gomez's plea to a different charge as being a plea to a felony rather than a misdemeanor; "If you pled to it as a misdemeanor, you know I am going to honor it and take care of business. But it's everybody's recollection as well as the state of the law you haven't pled to it.").

The California Supreme Court's rejection of the claim of ineffective assistance of counsel also has some support from the absence of certain information in Gomez's habeas petition that was prepared with the assistance of counsel. First, Gomez does not declare that he was not informed of the plea offer or the maximum sentence he faced; instead, his declaration describes counsel's failure to explain how particular sentences would be calculated if he was found guilty. While the maximum sentence Gomez faced at trial would be paramount in importance, the particular math used by the court to reach that sentence would not be.

Second, Gomez does not declare what he told his attorney about the plea offer at the time the offer was made to him. Comments by the court and counsel in the court record indicate that Gomez directed counsel to reject the offer because he wanted a drug treatment program in lieu of a custodial sentence, but Gomez's failure to explain what he thought and said contemporaneous with the plea negotiations is striking.

13

Third, Gomez presents no evidence as to what his attorney did tell him, other than to say that counsel said he could "beat" this case. Gomez did not report to the state habeas court that trial counsel refused to communicate with habeas counsel or refused to explain what had transpired in the plea negotiations. Even if trial counsel was unwilling to prepare a declaration for the habeas petition, Gomez could have provided in his own declaration some information about counsel's discussions with him, beyond simply that "he told me that we were going to beat the case." Because it is clear from the record that Gomez—at least at one point—wanted a drug treatment program instead of prison and eventually Gomez offered to take a 14-year deal after the prosecutor terminated the plea negotiations, it is obvious that there was more than this single sentence uttered by counsel.

Fourth, trial counsel turned over his file, yet there is no mention in the habeas petition of whether there were notes in the file about the plea negotiations or what any such notes stated. The absence of information as to what the attorney did discuss with the client about the plea reasonably could have been viewed by the California court as suggesting the absence of deficient performance. Insofar as Gomez urges that counsel did not push him hard enough to take a deal, the argument fails both because (a) the U.S. Supreme Court has never issued a holding explaining how much an attorney must push his client to take a deal the attorney sees as favorable and (b) Gomez has failed to provide details about what exactly counsel did discuss with him regarding the plea offer. On the record presented to it, it would have been a reasonable application of *Burt v. Titlow* for the California Supreme Court to conclude that Gomez had not overcome the presumption that counsel's conduct was within the range of reasonable professional advice. *See Burt*, 571 U.S. at 22-23 ("The absence of evidence that counsel gave constitutionally inadequate advice cannot overcome the presumption that counsel's conduct was within the range of reasonable professional advice."); *George v. Madden*, 794 F. App'x 681, 682 (9th Cir. 2020) (finding that there was insufficient evidence to show that petitioner was misadvised by counsel).

Even if the California Supreme Court accepted that Gomez was not advised about the twelve "facts," the state court could have found that failing to advise of those "facts" did not amount to constitutionally deficient performance. Many of the "facts" Gomez posits correspond to the outcome of the trial. For instance, "fact" two states that Gomez would "*certainly* be found guilty"

14

of the 245 charge. Dkt. No. 1 at 35 (emphasis added). "Fact" four states that the allegation of great bodily injury would also "*certainly* be found to be true." *Id.* And "fact" seven states that the prior-conviction allegations would "*certainly* be found to be true." *Id.* at 36. In advising a defendant, "[c]ounsel cannot be required to accurately predict what the jury or court might find." *Turner*, 281 F.3d at 881. Therefore, it would not have been unreasonable for the California Supreme Court to conclude that counsel would not have provided constitutionally deficient performance by failing to advise Gomez that he would "certainly" be found guilty of the allegations against him.

Moreover, the other "facts" that Gomez raises are that he had "no defense" to certain charges, so he had "no hope . . . of being sentenced to less than 12 years" if he went to trial. *See* Dkt. No. 1 at 35, 37. It may be conceded that Gomez did not have a defense to the prior-conviction allegations. But these enhancements were only applicable if Gomez was convicted of one of the felonies charged in the present case. *See, e.g.*, Cal Pen Code § 667(a)(1) ("[I]n addition to the sentence imposed by the court *for the present offense*, a five-year enhancement for each such prior conviction [shall be received].").

The state court could have concluded that Gomez did have a defense to both the attempted murder and the 245 charge. Because the burden of proof is on the prosecution in a criminal trial, Gomez had a defense that the prosecutor did not meet his burden of proof beyond a reasonable doubt. Gomez now argues that—because of the physical evidence—there "was no other possible explanation in the evidence" for the victim's injuries apart from an assault by Gomez. Dkt. No. 1 at 46. However, the state habeas court reasonably could have rejected this assertion. The defense theory at trial was that the victim wanted something from Gomez, such as drugs, Gomez refused to give them to him, there was a fight, and both the victim and Gomez got injured. *See* Dkt. No. 12-1 at 247. Gomez himself had lacerations on his chest and hands. There was ample evidence that would have allowed the jury to find that the victim was not credible; the victim had prior convictions, inconsistencies in testimony, substance abuse, and a recent psychiatric history. *See, e.g.*, *id.* at 121, 125, 149. The victim's description of the crime was an odd one, and defense counsel focused on that to forcefully argue that the victim was not credible. Defense counsel argued, for example, that the victim's report of having been verbally ordered to walk more than a mile to defendant's home

15

did not make sense, given that the victim was much bigger than Gomez and was not being threatened, *id.* at 234-35; the victim's story had changed over time, *see id.* at 238; that the victim's story "became even more implausible, bordering on hallucinatory" on cross-examination, *id.* at 237. If the victim's statements were discounted, there would be substantial gaps in the prosecution's case and Gomez's theory of the case could provide the jury with a reasonable doubt. Therefore, it was not guaranteed that Gomez would be convicted of the 245 charge or attempted murder and receive a sentence of nine years or longer if he went to trial.

Regardless of the reasons, the record is silent as to what Gomez's attorney advised him as to the advisability of taking the plea offer and why Gomez ultimately chose to reject the plea offer. This silent record cannot defeat the strong presumption that counsel acted appropriately. *See Burt*, 571 U.S. at 22-23. Therefore, the state court could reasonably have found that Gomez failed to show constitutionally deficient performance by his attorney.

### D. Prejudice

The prejudice prong of the *Strickland* test requires a petitioner to prove a "reasonable probability that, but for counsel's unprofessional errors, the result . . . would have been different." *Strickland,* 466 U.S. at 687-694. To establish prejudice from counsel's advice to reject a plea offer, petitioner must show that there is a reasonable probability that, but for counsel's errors, he would have accepted the plea, "the plea offer would have been presented to the court . . ., that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012). The Supreme Court recently noted of ineffective-assistance claims in the accepted plea context that "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). Similarly, in the rejected plea context, the Court must look to the "totality of the circumstances" to substantiate a defendant's claim that, but for counsel's advice, he would have accepted the plea. *See generally*

16

*Strickland*, 466 U.S. at 695.

Respondent argues that the state court could have found that Gomez was not prejudiced because his declaration is "self-serving and insufficient, in and of itself, to establish prejudice without independent, objective evidence of corroboration." Dkt. No. 11-1 at 17. Gomez disagrees. Largely relying on *Alvernaz* for support, he argues that "a substantial disparity between the plea offer and the potential sentence exposure constitutes strong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer." Dkt. No. 1 at 52 (discussing *In re Alvernaz*, 2 Cal. 4th 924 (1992)). He then applies *Alvernaz* to himself and argues that "the 'substantial disparity' between the 9-year [plea offer] and the 24-years-to-life sentence that he received is corroboration that, with proper advice, he would have accepted the offer." *Id.* at 59. Gomez's argument is unpersuasive.

In *Alvernaz*, the California Supreme Court considered a claim of ineffective assistance of counsel in the context of a rejected plea offer, approaching the claim wary of the "ease with which a defendant, after trial, may claim that he or she received inaccurate information from counsel concerning the consequences of rejecting a plea offer." *Alvernaz*, 2 Cal. 4th at 938; *cf. Lee*, 137 S. Ct. at 1967. The court identified the following as "[p]ertinent factors" to consider in evaluating whether, with effective assistance, a defendant would have accepted the plea offer: "whether counsel actually and accurately communicated the offer to the defendant; the advice, if any, given by counsel; the *disparity between the terms of the proposed plea bargain and the probable consequences of proceeding to trial, as viewed at the time of the offer*; and whether the defendant indicated he or she was amenable to negotiating a plea bargain." *Alvernaz*, 2 Cal. 4th at 938 (emphasis added). A defendant's stance at trial may also be considered, as protesting under oath that one is innocent generally tends to suggest he would not have desired to accept a plea offer. *See id.* at 940. *Alvernaz* is not controlling but is helpful in that it identifies some factors to consider as the court looks for corroboration for a post hoc assertion by a defendant that he would have taken the plea offer.[1]

---

[1] Gomez's effort to liken his situation to that of the defendant in *Alvernaz* falters because *Alvernaz* had a critically different fact: defense counsel in that case had misstated the maximum

17

Gomez relies on *Alvernaz* to argue that the substantial disparity between the plea offer of 9-years and the 24-to-life sentence he did receive provides evidence that he would have accepted the plea offer. Dkt. No. 1 at 59. But the sentence disparity discussed in *Alvernaz* is not so simple, as the California Supreme Court described the disparity as between the plea offer and the "probable consequences at trial, as viewed at the time of the offer." *In re Alvernaz*, 2 Cal. 4th at 938. *Alvernaz* does not simply compare the plea offer with the worst possible outcome or the actual outcome, but instead with the "probable consequences" at trial. This distinction is subtle but important, especially when it is unlikely that the worst possible outcome will occur. Where a criminal defendant is facing a high disparity between an offered plea and his probable outcome at trial, the defendant is more likely to accept the offer if properly advised because a properly informed client would be less likely to risk going to trial when his probable sentence at trial is substantially greater than the plea offer.

Here, the evidence indicates that counsel believed an attempted murder conviction was highly unlikely.[2] If an assault conviction was probable and an attempted murder conviction was highly unlikely, then the probable consequence of trial would be viewed more as that the likely

---

prison exposure facing the defendant. In *Alvernaz*, the petitioner faced several charges plus sentence enhancement allegations. After rejecting a plea offer that would have resulted in a maximum of four or five years in prison (with the likelihood of him being in prison no more than two-and-a-half years with time credits), Alvernaz went to trial, was convicted of all but one charge, and received a sentence of life with the possibility of parole, for which he expected to be confined for more than 16 years before being paroled. 2 Cal. 4th at 929-30. In the habeas action, Alvernaz declared that when he asked about the possibility of losing at trial, defense counsel had told him that the maximum penalty was about eight years (with the likelihood of him being in prison for only about four years with time credits) and there was a 70-80% chance the defense would prevail at trial. *Id.* at 930-31. Unlike the situation in *Alvernaz*, there is no evidence that Gomez's attorney misstated his maximum sentencing exposure. Because *Alvernaz's* facts are not comparable to Gomez's, *Alvernaz's* usefulness here is limited to its identification of pertinent factors to consider in evaluating whether a defendant would have accepted the plea offer.

[2] Gomez eventually appealed on the ground that the evidence was insufficient to support the attempted murder verdict, which provides some indication that Gomez would have believed before trial that the charge was unlikely to result in a conviction at trial. It also suggests that even after seeing the evidence that ultimately was presented, Gomez, trial counsel, and appellate counsel felt that the evidence did not show attempted murder. Some support for this view can be found in the California Court of Appeal's opinion which rejected Gomez's challenge to the sufficiency of the evidence of attempted murder but "acknowledge[d] that a reasonable jury might have concluded that Gomez, despite his statements, did not truly intend to kill the victim because some of his actions were inconsistent with that purpose." *People v. Gomez*, slip op. at 7. All of this supports a view that an attempted murder conviction was not among "the probable consequences of proceeding to trial, as viewed at the time of the offer," *Alvernaz*, 2 Cal. 4th at 938.

1    sentence would be somewhere between 12-16 years (assuming Gomez's declaration correctly
2    identifies the sentencing options), and the disparity identified in *Alvernaz* would be the difference
3    between the 9-year plea offer and the probable 12-16 year sentence if convicted. That disparity is
4    substantially less than the disparity between a 9-year offer and a 27-to-life sentence (i.e., the worst
5    possible outcome) or a 24-to-life sentence (i.e., the actual outcome). The materials in the record
6    indicate that defense counsel did not believe an attempted murder conviction was likely, and
7    Gomez's position on appeal was that the evidence was insufficient to support an attempted murder
8    conviction.

The disparity between the 9-year offer and the probable 12-16 year sentence if convicted provides some corroborating evidence that Gomez would have taken the deal. But there also is evidence in the record that the victim had substantial credibility problems, making such a conviction less of a certainty. And there is no evidence that counsel did not accurately communicate the plea offer to Gomez. *See Alvernaz*, 2 Cal. 4th at 938 (whether counsel accurately communicated the offer to defendant is a factor to consider in determining whether he would have accepted the plea). Additionally, the record supports a determination that Gomez rejected the plea offer that involved prison time because he wanted a drug treatment program instead of prison time, and there is no indication that he budged from this position until after the prosecutor terminated the plea negotiations. *See id.* (defendant's indication of his amenability to negotiating a plea is a factor to consider in determining whether he would have accepted the offer). On this record, it would not have been an unreasonable application of clearly established federal law as set forth by the U.S. Supreme Court for the California Supreme Court to conclude that Gomez had not established prejudice under the *Strickland* test. Gomez is not entitled to the writ on his claim that he received ineffective assistance of counsel.

## IV. Denial of Certificate of Appealability

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**CONCLUSION**

The petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: October 16, 2020

_____
SUSAN ILLSTON
United States District Judge